ams

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS**

ROVELL R. HESLET,                          )
                                           )
                    Plaintiff,             )
                                           )
vs.                                        )
                                           )          Case No. 03-4144-JAR
WESTAR ENERGY, INC. d/b/a/                 )
JEFFREY ENERGY CENTER,                     )
                                           )
                    Defendant.             )
_____)

**<u>MEMORANDUM AND ORDER GRANTING DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT</u>**

Defendant moves for summary judgment (Doc. 24) in this Age Discrimination in Employment Act (ADEA) case.  The Court grants summary judgment because although plaintiff has demonstrated genuine issues of material fact with regard to his prima facie case of disparate treatment because of age, he has not with regard to whether defendant's stated reason for his termination was a pretext for discrimination. Defendant's decision to terminate plaintiff was a business decision that this court may not second-guess; and, there is no evidence that similarly situated non-protected individuals were treated more favorably despite comparable violations of company policy.  Furthermore, neither stray remarks by intermediate management nor offering a voluntary severance program with early retirement incentives are probative of pretext for discrimination based on age.

## I. Summary Judgment Standard

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."[1]  A fact is only material under this standard if a dispute over it would affect the outcome of the suit.[2]  An issue is only genuine if it "is such that a reasonable jury could return a verdict for the nonmoving party."[3]  The inquiry essentially determines if there is a need for trial, or whether the evidence "is so one-sided that one party must prevail as a matter of law."[4]

The moving party bears the initial burden of providing the court with the basis for the motion and identifying those portions of the record that show the absence of a genuine issue of material fact.[5] "A movant that will not bear the burden of persuasion at trial need not negate the nonmovant's claim."[6] The burden may be met by showing that there is no evidence to support the nonmoving party's case.[7] If this initial burden is met, the nonmovant must then "go beyond the pleadings and 'set forth specific facts' that would be admissible in evidence in the event of trial from which a rational trier of fact could

---

[1] Fed. R. Civ. P. 56(c).

[2] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986).

[3] *Id.*

[4] *Id.* at 251-52, 106 S. Ct. at 2512.

[5] *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553, 91 L. Ed. 2d 265 (1986).

[6] *Thom v. Bristol-Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2003) (citing *Celotex Corp.*, 477 U.S. at 325, 106 S. Ct. at 2548)).

[7] *Id.*

2

find for the nonmovant."[8]  When examining the underlying facts of the case, the Court is cognizant that

all inferences must be viewed in the light most favorable to the nonmoving party and that it may not

make credibility determinations or weigh the evidence.[9]

## II.  Factual Background

The following facts are either uncontroverted, stipulated to, or viewed in the light most

favorable to plaintiff.  Defendant Westar Energy, Inc. (Westar) operates the Jeffrey Energy Center

(JEC), a coal-fired generating station near St. Mary's, Kansas.  Plaintiff Rovell Heslet worked at the

JEC from August 18, 1980 to April 25, 2002, most recently as a Journeyman Mechanic.  Frank Boyce

was Heslet's direct supervisor; Dave Claussen, maintenance superintendent, was Boyce's supervisor;

and Dave Neufeld was the plant manager.  Heslet was 51 years old at the time his employment with

Westar ended.

Westar distributed a Human Resources Policies and Procedures Manual (Manual) to its

employees, which included the company's code of ethics.  One provision of the code of ethics explicitly

disallows taking or using "property of the Company for personal use except as authorized by Company

policy."  The Manual provided that a violation of Westar's code of ethics "is grounds for disciplinary

action up to and including suspension or dismissal."  Heslet signed an acknowledgment and disclosure

form on May 17, 2001, stating that he read and understood the code of ethics.

The Manual also included Westar's policy to effect constructive corrective action. Included in a

---

[8]  *Id.*

[9]  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000);
*Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986).

list of conduct warranting corrective action was "unauthorized removal, damage to, or destruction of

Company property/equipment."  The Manual listed four types of possible corrective measures to be

taken by management: (1) oral warning, (2) written warning, (3) suspension, and/or (4) discharge.

Under the description of "suspension," the Manual provided: "A suspension of indefinite duration is

imposed when circumstances surrounding an alleged violation need further investigation before final

action may be taken."

### *Devader Reports of Theft*

From approximately 2000 to 2002, Heslet had a personal relationship with Roberta Devader.

In late 2001, Devader anonymously telephoned plant manager Neufeld, informing him that Heslet was

stealing certain items from the JEC.  Westar did not investigate this anonymous tip.  However, Claussen

called Heslet and Boyce into his office and asked Heslet if he had been stealing property from the

company.  Heslet denied taking any property and told Claussen that he understood the severity of

consequences for stealing from the company.  Prior to this meeting, Heslet had a positive track record

of employment at Westar.  He was considered superior in terms of his safety initiatives and he had

demonstrated a positive attitude.

In April 2002, Devader again attempted to reach Neufeld by telephone; however, Claussen

ultimately responded to her message.  Devader reported that Heslet was stealing from the company

again.  On April 22 or 23, 2002, Claussen and Neufeld went to Devader's house to meet with her.[10]

At that time, Devader provided them with two zip-lock bags full of batteries and three flashlights that

---

[10]   Neufeld's notes initially indicate that he had meetings with Heslet and Devader on April 23 and 24.
Later, those notes state that they went to Devader's home on April 22.  Claussen's notes indicate that the meeting
occurred on April 23.

she claimed Heslet had given to her, as well as photographs of other items she believed were property

of Westar.  These photographs depicted cases of WypAlls, cleaning products, gloves, packages of

batteries, multiple flashlights, and screws.  The photographs depicted these items in various locations of

Heslet's home: on kitchen counters; in drawers; and on top of the refrigerator.  Devader told Claussen

that she took the photographs in December 2001 and on March 13, 2002, and that on occasion,

Heslet jokingly referred to the JEC as "K Mart North."

### Meetings with Heslet and Subsequent Investigation

After returning from Devader's house, Claussen and Neufeld met with Heslet, Boyce, and Jim

Smith, a union steward.  Neufeld informed Heslet of the accusations and that they had acquired

photographs depicting the allegedly stolen property inside Heslet's home.  Neufeld showed Heslet

some of these photographs.  Heslet denied stealing any of the property in question; and when

confronted with photographs, he provided an explanation for each of the items at issue.  He explained

that some of the items, such as the batteries and flashlights, were Westar property that ended up in his

pockets or bag at the end of the workday because he carried them with him on the job for safety

purposes.  He explained that on occasion, he took work gloves home to launder.  Heslet  told Neufeld

that he intended to return such items.  Heslet further explained that he had purchased the cases of

WypAlls from a NAPA store in St. Mary's.  Heslet also indicated that he had loaned some of the items

to Devader, but told her she would have to return the items to Heslet.  At the end of this meeting,

Neufeld placed Heslet on indefinite suspension pending an investigation.

After this meeting, Westar obtained a written statement from Devader dated April 22, 2002.  In

this statement, Devader described various items she had seen in Heslet's house and garage, which she

5

believed he had taken from the JEC. She also detailed incidents of Heslet giving her items that she believed were Westar property. Devader stated that Heslet did not ask for her to return these items. In addition to the batteries, flashlights, screws, gloves, and cleaning products, Devader itemized other Westar property given to her by Heslet: hand lotion, "green scratchers," hamburger, toothpaste, and pop. Neufeld determined, however, that the JEC did not stock hamburger, toothpaste or pop.

Claussen's notes indicate that in an April 24, 2002 phone conversation, Devader alleged that Heslet's explanations were false. Devader also provided him with the names of other persons whom Heslet may have given stolen items to. No one at Westar attempted to contact these persons. However, Westar personnel did contact the NAPA store in St. Mary's, and learned that the store did stock WypAlls and may have sold the WypAlls to Heslet.

### *Heslet's Resignation*

The next day, on April 24th or 25th, Neufeld decided to terminate Heslet, because he believed the allegations of theft. That same day, Heslet returned some of those items that he had claimed he accidentally took home. In a meeting attended by Claussen, Heslet and Todd Newkirk, a union steward, Neufeld informed Heslet of his decision to terminate Heslet. Immediately after that, Heslet and Newkirk met to discuss Heslet's options; and Newkirk informed Heslet that he could resign to keep the termination off of his record and resume. Within minutes of this conversation, Heslet informed Neufeld that he agreed to resign. Had Heslet not tendered his resignation, he would have been terminated. After Heslet's resignation, his job duties were assumed by three existing employees: Gerald Cornett, born in 1952, Stephen Schimmel, born in 1951, and Alfred Brown, born in 1951.

### *Other Employees*

In the summer of 2001, before Helset was accused of theft, two Westar employees were caught stealing items from the JEC.  First, Jeff Wehner, a 32 year old employee, was caught stealing one box of trash bags.  When Wehner met with a supervisor, Lynn Ballenger, and Claussen about the incident, Wehner apologized and offered to pay for the trash bags.  Ballenger urged Claussen to give credence to Wehner's apology and not terminate him.  Claussen imposed a thirty day suspension without pay; and Wehner was required to sign a "last chance agreement," providing that if he was disciplined again he would be subject to termination.  Second, Mike Weisbender, a 41 year old employee, was disciplined for taking two pairs of safety gloves.  When Weisbender met with Neufeld about the matter, Weisbender admitted to taking the gloves.  The union steward advocated for Weisbender and against termination.  Neufeld imposed on Weisbender, a five day suspension without pay; and Weisbender was required to sign a "last chance agreement."

Sometime after these incidents in the summer of 2001, Heslet's immediate supervisor, Boyce, told Heslet and his crew that the "older guys" should "watch you're A-S-S," because the company was looking for a reason to get rid of older workers.  On December 6, 2001, Westar informed its employees that the Board of Directors approved a voluntary severance program for those who voluntarily terminated employment before January 31, 2002.  The program provided a severance package for all employees, regardless of age, and retirement enhancements for those aged 52 and older.

**III. Discussion**

Westar moves for summary judgment on Heslet's sole claim–that he was subjected to disparate treatment because of his age, when he was terminated.  Under the ADEA, it is unlawful for an employer

7

"to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age."[11] The ADEA limits its coverage to those individuals over the age of 40.[12] An ADEA plaintiff has the burden of proving that age was a determining factor in the employer's challenged decision.[13] Although the plaintiff need not show that age was the sole reason for the challenged action, age must have "made the difference" in the employer's decision.[14] "[A]n ADEA plaintiff may proceed by either of two general methods to carry the burden of making her or his case. A party may attempt to meet his burden directly, by presenting direct or circumstantial evidence that age was a determining factor in his discharge. Or, more typically, a party may rely on the proof scheme for a prima facie case established in *McDonnell Douglas Corp. v. Green*."[15]

Absent any direct evidence of discrimination because of an employee's age, the Court will employ the burden-shifting framework set out by the Supreme Court in *McDonnell Douglas Corp.*[16] and *Texas Department of Community Affairs v. Burdine*.[17] Under this framework, Heslet must first

---

[11]  29 U.S.C. § 623(a)(1).

[12]  29 U.S.C. § 631(a).

[13]  *Greene v. Safeway Stores, Inc.*, 98 F.3d 554, 557-58 (10th Cir. 1996) (quoting *Lucas v. Dover*, 857 F.2d 1397, 1400 (10th Cir. 1988) (internal quotation omitted)).

[14]  *Id.* (quoting *EEOC v. Sperry Corp.*, 852 F.2d 503, 507 (10th Cir. 1988)).

[15]  *Id.* (internal citations and quotations omitted).

[16]  411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973).

[17]  450 U.S. 248, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981).

prove a prima facie case of age discrimination.[18]  If Heslet is able to sustain this burden, the burden of production shifts to Westar to "articulate a legitimate, nondiscriminatory reason for rejection."[19]  If Westar sustains this burden, the burden of production shifts back to Heslet to show that Westar's proffered reason for rejection is false, or merely a pretext, and the presumption of discrimination created by establishing a prima facie case "drops out of the picture."[20]  Although the burden of production shifts back and forth between the parties, the ultimate burden of persuasion remains at all times with the plaintiff.[21]

### A.  The Prima Facie Case

Establishing a prima facie case is "not an onerous burden," and gives rise to an inference of discrimination by eliminating the most common nondiscriminatory reasons for plaintiff's treatment.[22]  Heslet alleges that he was terminated by Westar because of his age.  Generally, to establish a prima facie case of discrimination due to wrongful termination, a plaintiff must show that: (1) plaintiff is a member of a protected class; (2) plaintiff was qualified for the job; (3) despite these qualifications, plaintiff was discharged; and (4) the job was not eliminated after plaintiff was discharged.[23]

Westar does not dispute that Heslet fulfilled his burden with respect to the first two elements of

---

[18]  *See id.* at 252-53, 101 S. Ct. at 1093; *McDonnell Douglas Corp.*, 411 U.S. at 802, 93 S. Ct. at 1824.

[19]  *See McDonnell Douglas Corp.*, 411 U.S. at 802, 93 S. Ct. at 1824.

[20]  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143,120 S. Ct. 2097, 2106, 147 L. Ed. 2d 105 (2000) (quoting *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 50, 113 S. Ct. 2742, 125 L. Ed. 2d 407 (1993)).

[21]  *Burdine*, 450 U.S. at 253, 101 S. Ct. at 1093.

[22]  *Id.* at 254, 101 S. Ct. at 1094.

[23]  *See, e.g., Munoz v. St. Mary-Corwin Hosp.*, 221 F.3d 1160, 1165-66 (10th Cir. 2000); *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1227-29 (10th Cir. 2000); *Perry v. Woodward*, 199 F.3d 1126, 1135 (10th Cir. 1999).

the prima facie case.  However, Westar argues that there is no genuine issue of material fact with respect to the third or fourth prongs of the prima facie case.  Westar maintains that because Heslet resigned, he was not "terminated," as contemplated by the statute.  Further, Westar argues that Heslet's job was in fact eliminated, as no significantly younger individual was hired to replace him. Heslet insists that his resignation in the face of termination constituted  "termination" under the statute. He also argues that under Tenth Circuit precedent, he need not prove that he was replaced by a younger worker under the fourth prong of the prima facie case.

### 1.  Termination

Westar argues that a plaintiff must demonstrate either termination or  constructive discharge and that Heslet is unable to show either.  Heslet argues that because he resigned only in the face of imminent termination, he was "terminated" within the meaning of the statute, and that  his act of resignation "does not convert the case from a termination action to a constructive discharge."

Discharge, or termination, is a required element of the prima facie case in employment discrimination cases for wrongful termination, unless the plaintiff is able to prove constructive discharge.[24]  Westar relies on Judge Murgia's decision in *Robinette v. National Credit Services Corp,*[25] arguing that a resignation does not satisfy the requisite element of termination for a prima facie

---

[24]  Heslet urges the Court to only require an "adverse employment action" as the third prong of his prima facie case.  However, "adverse employment action" necessarily subsumes "termination" or "discharge."   The true issue is whether Heslet was in fact "terminated," which necessarily would also mean he suffered an adverse employment action.  *Compare Kendrick*, 220 F.3d at 1227 n.6, 1229 (providing the elements of discriminatory discharge cases and explaining that they are the same as those for failure to hire cases) *with Sanchez v. Denver Pub. Sch.*, 164 F.3d 527, 531 (10th Cir. 1998) (providing for "adverse employment action" instead of "termination" requirement in a case involving transfer).

[25]  182 F. Supp. 2d 1055 (D. Kan. 2001).

case of discriminatory discharge.  But the *Robinette* case is inapposite, for that plaintiff resigned after being given a choice of termination or demotion;[26] and there was no evidence that a demotion "would have subjected plaintiff to working conditions that a reasonable person would view as intolerable." Because that plaintiff had such an option, there was no showing of the elements of constructive discharge.[27]  Thus, the plaintiff in *Robinette* was not terminated or constructively discharged, and therefore, failed to establish a prima facie case of discriminatory discharge.[28]

Although Heslet was not terminated, the Court finds that he easily meets the requisite standards for constructive discharge, thus fulfilling the termination element of his prima facie case.  The Tenth Circuit has recognized that a plaintiff, when faced with a decision between termination and resignation, can prove constructive discharge, and thus fulfill the "termination" requirement of the prima facie case.[29] Heslet was given two options, resignation or termination.  Moreover, Heslet did not resign voluntarily. Whereas in  *Robinette*, the plaintiff could have accepted the demotion instead of termination or resignation, Heslet was not provided with any true alternative to resignation.  By all accounts, only minutes transpired between the announcement of Heslet's termination and his request to resign, and the

---

[26]  *Id.* at 1059.

[27]  *Id.*

[28]  Westar suggests that Heslet was required to plead constructive discharge in order for the Court to consider that with respect to the termination prong of the prima facie case.  Judge Murgia decided this issue on the merits in *Robinette* despite the fact that constructive discharge was not alleged by the plaintiff.  *Id.*

[29]  *Burks v. Okla. Publ'g Co.*, 81 F.3d 975, 978 (10th Cir. 1996), *cert. denied*, 519 U.S. 931, 117 S. Ct. 302, 136 L. Ed. 2d 220 (1996); *Acrey v. Am. Sheep Indus. Ass'n*, 981 F.2d 1569, 1573-74 (10th Cir. 1992); *Spulak v. K Mart Corp.*, 894 F.2d 1150, 1154 (10th Cir. 1990); *Nowlin v. K Mart Corp.*, 232 F.3d 902 (Table), No. 99-3186, 2000 WL 1588116, at *3 (10th Cir. Oct. 25, 2000).

record does not suggest that Heslet had any input into the effective date of resignation.[30]   Thus, Heslet

has made out a prima facie case through showing constructive discharge.

### 2.  Status of Job After Termination or Discharge

The parties disagree over how the fourth prong of Heslet's prima facie case should be

formulated under Supreme Court and Tenth Circuit precedent.  Westar argues that Heslet must

establish that he was replaced by a significantly younger worker, or alternatively, that Westar intended

to discriminate against him on the basis of age.  Heslet argues that under the Supreme Court's decision

in *O'Connor v. Consolidated Coin Caterers Corp.*,[31] a plaintiff is not required to prove replacement

by a worker outside the protected class.

In *Kendrick v. Penske Transportation Services, Inc.*,[32] the Tenth Circuit clarified that the

fourth element, as set forth in *Perry v. Woodward*, that the job was not eliminated after the discharge,

is the appropriate formulation in a discriminatory discharge case.[33]  The court further explained that in

the wake of the *O'Connor* decision,

> [s]ome confusion regarding the fourth prong of the plaintiff's
> prima facie case in a discharge situation crept into our nomenclature in

---

[30]*See, e.g., Parker v. Bd. of Regents of Tulsa Junior. Coll.*, 981 F.2d 1159, 1162-63 (10th Cir.1992) (listing
factors to determine voluntariness of resignation: whether there was an alternative to resignation, whether the
employee understood the nature of the choice given, whether the employee was given a reasonable amount time in
which to choose, and whether the employee was allowed to select the effective date of resignation).

[31]  517 U.S. 308, 116 S. Ct. 1307, 134 L. Ed. 2d 433 (1996).

[32]  220 F.3d 1220, 1226-29 (10th Cir. 2000).

[33]  *Id.* at 1229.  *But see Munoz v. St. Mary-Corwin Hosp.*, 221 F.3d 1160, 1166 n.3 (10th Cir. 2000) (explaining
in a decision rendered one day before *Kendrick* that the Tenth Circuit has not addressed whether *Perry v.
Woodward* applies to ADEA claims).

later cases where, occasionally, we would articulate the fourth prong of the prima facie case as requiring a plaintiff to show that the replacement employee was of nonprotected status.  However, the language in most of these cases may be characterized...[and]... dismissed as dicta for one of the following four reasons: either (1) this court assumed that plaintiff had established a prima facie case without deciding the issue; (2) evidence was presented by the plaintiff that his or her replacement was of nonprotected status and thus the necessity of making such a showing was not an issue; (3) the case went to trial; or (4) this court decided that plaintiff had failed to establish a different prong of the prima facie case.[34]

Given that Helset must prove that the job was not eliminated, the Court considers Westar's argument, that because Heslet's job was absorbed by existing employees who were insignificantly younger than Heslet, he is unable to fulfill this fourth element of the prima facie case.  It is uncontroverted that Westar did not hire any new employee to replace Heslet.  Here, the only evidence Heslet offers, is evidence suggesting that similarly situated, younger employees were retained; and therefore, treated more favorably.  This Court has previously stated that it is unclear whether a plaintiff may establish a prima facie case by showing that similarly situated younger individuals were treated more favorably in that they were retained.[35]  Even if plaintiff has established this prong of the prima facie case, the Court necessarily proceeds to address whether Westar has provided a legitimate, non-discriminatory reason for Heslet's termination.

### B.  Legitimate, Non-Discriminatory Reason for Rejection

Westar easily sustains its burden of production by articulating a legitimate, non-discriminatory

---

[34] *Id.* at 1228 (footnote and citations omitted).

[35] *Campbell v. Meredith Corp.*, 260 F. Supp. 2d 1087, 1104 (D. Kan. 2003) (explaining that in the situation where no replacement was hired it may suffice to modify the prima facie case to instead require that similarly situated employees were retained, as it has been modified in reduction in force cases).

13

reason for terminating Heslet.  Westar believed allegations that Heslet had stolen multiple items of company property.  Theft of company property is a legitimate, non-discriminatory reason for termination.  Westar's Manual instructs that theft of company property is an action that warrants corrective action.

### C. Pretext

Given the articulated legitimate reason, Heslet must come forward with evidence presenting a genuine issue whether Westar's stated reasons for terminating him were pretextual.  Heslet offers that pretext is shown by: (1) Westar's allegations of theft are unfounded because Heslet had legitimate reasons for possessing all of the items at issue; (2) similarly situated employees were merely suspended, not terminated; (3) comments by "management level employees" reflected an intent by Westar to discriminate against "older guys;" and (4) Westar sought to eliminate older workers by offering an early retirement program just before Heslet was terminated.  None of these raises an issue of fact concerning pretext.

### 1.  The Theft Allegations are Unfounded

A defendant's stated reason for termination is not deemed pretextual simply because it proved to be a poor business decision.[36]  Rather, the test is whether the employer had a good faith belief in its proffered non-discriminatory reason for termination.[37]  Here, if Westar believed Devader's allegations of theft and terminated Heslet for that reason, then its belief would not be pretextual, even if it later

---

[36] *Rivera v. City & County of Denver*, 365 F.3d 912, 924-25 (10th Cir. 2004); *McKnight v. Kimberly Clark Corp.*, 149 F.3d 1125, 1129 (10th Cir. 1998).

[37] *Hardy v. S.F. Phosphates Ltd.*, 185 F.3d 1076, 1080 (10th Cir. 1999); *McKnight*, 149 F.3d at 1129.

14

turned out to be wrong.[38]  "Nevertheless, [p]retext can be shown by such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons."[39]  In evaluating pretext, the Court looks to the facts as they appeared to the decisionmaker, Neufeld, in April 2002, at the time of his decision to terminate.[40]

Under the relevant standards, this Court need not determine whether or not Heslet in fact stole property from Westar.  Rather, this Court determines whether a rational trier of fact could conclude, based on the record, that the stated reason for Heslet's termination is worthy of credence.  The record provides ample reason to find credible, Westar's articulated reason for terminating Heslet.  Devader, a friend of Heslet, gave specific information about the nature and location of stolen items and Heslet's admissions about taking the items.  Devader's accusations were corroborated by photographs she took.  The theft had reportedly occurred over a period of time.  Heslet offered a partial admission that some items belonged to Westar.  But Heslet also offered implausible or questionable denials and/or explanations for his acquisition or possession of other items.  Westar maintains that it simply made a business judgment in choosing to believe Devader instead of Heslet and that this Court may not second-guess that judgment.  The Court agrees.   At the time he fired Heslet, Neufeld believed that Heslet was guilty of theft.  Heslet's mere assertion that this was not a reasonable belief is insufficient to

---

[38]  *See McKnight*, 149 F.3d at 1129.

[39]  *Rivera*, 365 F.3d at 925 (quoting *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir.1997)).

[40]  *E.g.*, *id.*; *Campbell v. Meredith Corp.*, 260 F. Supp. 2d 1087, 1105-06 (D. Kan. 2003).

prove that Westar's stated reason for his termination was pretextual.

### 2.  Similarly Situated Employees

Heslet argues that Westar's treatment of Wehner and Weisbender suggests pretext because these significantly younger similarly situated employees were suspended, not terminated for similar conduct.  A plaintiff may show pretext by proving that similarly situated nonprotected employees were treated more favorably for committing comparable conduct.[41]  "Similarly situated employees are those who deal with the same supervisor and are subject to the same standards governing performance evaluation and discipline."[42]  It is uncontroverted that Nefuled was the supervisor who made the ultimate decisions in discipline of Wehner, Weisbender, and Heslet.  It is also uncontroverted that all three men were subject to the same policies in the company Manual.  Thus, Wehner and Weisbender were "similarly situated employees."

Yet every difference in treatment between similarly situated employees is not probative of pretext, for

> [l]arge employers must deal with a multitude of employment decisions, involving different employees, different supervisors, different time periods, and an incredible array of facts that will inevitably differ even among seemingly similar situations.  What the law does require is that an employer not discriminate against an employee on the basis of the employee's protected class characteristics. Differences in treatment that are trivial or accidental or explained by a nondiscriminatory motive will not sustain a claim of pretext.[43]

---

[41]  *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1232 (10th Cir. 2000).

[42]  *Rivera*, 365 F.3d at 922-23 (quoting  *Aramburu v. Boeing Co.*, 112 F.3d 1398, 1404 (10th Cir.1997) (internal quotation marks omitted)).

[43]  *Kendrick*, 220 F.3d at 1232 (internal quotation and citations omitted).

Here, any difference in treatment is explained by a nondiscriminatory motive. Both Wehner and Weisbender were disciplined for isolated incidents of stealing single items. Wehner apologized when confronted by his superiors and offered to pay for the trash bags that he took. Similarly, Weisbender confessed to taking the gloves and apologized. Moreover, Ballenger advocated against termination of Wehner and the union steward advocated against termination for Weisbender. Moreover, both men signed "last chance agreements," which allowed for termination if another incident of theft occurred.

Heslet's infractions were more severe, and his response was less laudable. Devader's allegations and photographs demonstrated to Neufeld, a widespread pattern of stealing many items of company property, over a period of time. Heslet neither confessed nor apologized; and the union steward did not advocate for him. And, consistent with the policy in the Manual, Heslet was suspended, albeit one day, before his termination, pending completion of the investigation. Finally, the Court notes that Westar's treatment of Weisbender supports Westar's claim that it did not have a policy of discriminating based on age. Weisbender was 41 years old at the time of his discipline–within the protected class of the ADEA, although younger than Heslet. Rather than using theft as a pretext to terminate Weisbender, it made a business judgment to give him another chance so long as the theft was an isolated occurrence.

### 3. Remarks by Management

Heslet claims that two comments by management level employees support his assertions of pretext. But the Court must disregard one of these comments, attributed to Ray Waldo, a coordinator at the JEC. The only evidence of this comment was is Heslet's deposition testimony that Doug Owens,

17

another employee, relayed Waldo's comment to Heslet.  There is no statement or affidavit by Waldo or

Owens attesting to this.  Because this is inadmissible hearsay evidence, the Court may not consider it on

summary judgment.[44]

Heslet also cites a comment made by Boyce in a crew meeting sometime in 2001, warning the

older men that the company was looking to get rid of "older guys."  The Court finds that this evidence

does not support a case of discrimination based on direct evidence or pretext under the *McDonnell*

*Douglas Corp.* framework.  This sole, stray remark was made by an intermediate supervisor who did

not made the decision to terminate Heslet.  Stray remarks, remarks made by non-decision makers, and

remarks made by decision makers that are unrelated to the actual decision making process do not

demonstrate discriminatory intent.[45]  Short of showing such an intent, this evidence may not suffice to

present a genuine issue of material fact in this case.  Heslet has presented no evidence that this comment

came from Neufeld, or that Neufeld considered age when he made the decision to terminate Heslet.

Therefore, this evidence does not show pretext or a discriminatory intent on the part of Neufeld.

### 4. Early Retirement Program

Finally, Heslet argues that Westar's voluntary severance program offered in December 2001 is

evidence that it sought to eliminate older workers.  This argument lacks merit because the ADEA

explicitly creates a safe harbor for voluntary early retirement plans that are "consistent with the relevant

---

[44] *Jeffries v. Kansas*, 147 F.3d 1220, 1224 (10th Cir. 1998).

[45] *McCrary v. Aurora Pub. Sch*., 57 Fed. Appx. 362, 367-68, No. 02-1098, 2003 WL 191433, at *3 (10th Cir. Jan. 29, 2003) (quoting *Clearwater v. Indep. Sch. Dist. No. 166*, 231 F.3d 1122, 1126 (8th Cir. 2000)).

purpose or purposes" of the ADEA.[46]   Here, Westar's plan was not limited to workers of retirement age or even workers over age 40.   The severance package was available to any employee, regardless of age; therefore, that aspect of the program was not targeted at older workers.   Moreover, the retirement enhancement package offered by Westar as part of this program is "accurately perceived not as a sign of discrimination, but as a benefit to the recipient."[47]   The fact that the company offered this program to its employees does not provide evidence of pretext.

      **IT IS THEREFORE ORDERED** that Defendant's Motion for Summary Judgment (Doc. 24) is **GRANTED**.

      IT IS SO ORDERED.

      Dated this _29th_   day of March, 2005.

                            **S/ Julie A. Robinson**            

                            **Julie A. Robinson**
                            **United States District Judge**

---

[46]   29 U.S.C. § 623(f)(2)(B)(ii); *see Fagan v. New York State Elec. & Gas Corp.*, 186 F.3d 127, 133 (2d Cir. 1999) (explaining the legislative intent behind the ADEA and explaining that the existence of a lawful voluntary retirement program does not, in and of itself, prove discriminatory animus).

[47]   *Fagan*, 186 F.3d at 133.